J-S10031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO A.V., N.L.C.C. AND B.E.C.C., MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.C. A/K/A L.M. A/K/A L.C.M., MOTHER | |
| | No. 2256 EDA 2015 |

Appeal from the Decrees July 1, 2015
in the Court of Common Pleas of Lehigh County
Orphans' Court at No.: A2014-0041, A2014-0042, A2014-0043

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED MARCH 30, 2016**

L.C., a/k/a L.M., a/k/a/ L.C.M. (Mother) appeals from the decrees of the Court of Common Pleas of Lehigh County (trial court), entered July 1, 2015, that granted the petitions to terminate her parental rights to her daughters, A.V., born in February of 2004, and N.L.C.C., born in June of 2006, and her son, B.E.C.C., born in January of 2008 (Children). We affirm on the basis of the trial court's July 1, 2015 adjudication.[1]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] A.V.'s father voluntarily relinquished his parental rights in person at a hearing on September 5, 2014. The father of N.L.C.C. and B.E.C.C.
*(Footnote Continued Next Page)*

The trial court has set forth the relevant history of this case in its findings of fact in its adjudication entered July 1, 2015. (**See** Trial Ct. Adjudication, at 2-21).[2] We adopt those findings for the purposes of this appeal.

The Lehigh County Office of Children and Youth Services filed petitions to terminate Mother's parental rights to the Children on July 7, 2014. The trial court held hearings on those petitions on September 5, 2014, and December 11 and December 12, 2014. The trial court entered its decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b), and its adjudication in support of those decrees on July 1, 2015. Mother filed her notice of appeal and statement of errors complained of on appeal on July 27, 2015. **See** Pa.R.A.P. 1925(a)(2)(i). In response, on August 10, 2015, the trial court entered a statement pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(ii) in which it stated that it had addressed the reasons for its decisions in its adjudication of July 1, 2015. **See** Pa.R.A.P. 1925(a)(2)(ii).

Mother raises the following questions on appeal:

_(Footnote Continued)_ ────────────────

voluntarily relinquished his parental rights in a written consent he signed on August 28, 2014. (**See** Trial Court Adjudication, 7/01/15, at 2 n. 1).

[2] We have redacted the copy of the trial court's July 1, 2015 adjudication attached to this decision only to remove identifying information of certain individuals. **See** Superior Court I.O.P. 424A (providing that Superior Court decisions related to custody proceedings shall not contain the names of minors or identifying information of any other individuals involved).

1. Whether the trial court abused its discretion and committed an error of law by terminating [M]other's parental rights when such determination was not supported by clear and convincing evidence under 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)?

2. Whether the trial court trial court [sic] abused its discretion and committed an error of law by holding that termination will serve the developmental, physical, and emotional needs and welfare of the Children?

(Mother's Brief, at 7).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

**In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

- 3 -

***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). (***See*** Trial Ct. Adjudication, at 25-32). However, in order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a), and we therefore confine our discussion to subsection (a)(1). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Requests to have a natural parent's parental rights terminated are governed by Section 2511 of the Adoption Act, which provides, in pertinent part:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \*    \*    \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further,

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

To terminate parental rights pursuant to Section 2511(a)(1), the person or agency seeking termination must demonstrate through clear and convincing evidence that, for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates a settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

With respect to subsection 2511(a)(1), our Supreme Court has held:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988) (citation omitted). Further,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citations omitted).

In regard to incarcerated persons, our Supreme Court has stated:

[I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that [sic] the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012).

Further, in *In re Adoption of S.P.*, the Pennsylvania Supreme Court stated:

[W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether

"the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.*, 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [*In re:*] *E.A.P.*, [944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*Id.* at 830-31.

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

With the above standard of review in mind, we have thoroughly reviewed the record, briefs, and the applicable law, and determined that the

evidence presented is sufficient to support the trial court's decrees terminating Mother's parental rights to the Children pursuant to Section 2511(a)(1).

In addition, our close reading of the trial court's adjudication reveals that the court carefully and methodically reviewed the evidence and ably addressed Mother's issues presented on appeal. (*See* Trial Ct. Adjudication, at 25-32). Accordingly, we affirm on the basis of the concise, thoughtful, and well-written adjudication of the Honorable Douglas G. Reichley. (*See id.* at 25-27 (finding Mother failed "to perform parental duties for a period of at least six months immediately preceding the filing of the petition[]" where: (1) for twenty-one months prior to the hearing, Mother failed to perform parental duties for Children because she was incarcerated; (2) Mother has refused to comply with court orders requiring her to obtain and maintain stable housing and legal income; (3) Mother does not take A.V. to court-ordered trauma therapy; (3) Mother has not completed non-offending parenting treatment and follow its directives; (4) Mother has not complied with the terms of her probation, "even though she knew that choice could send her to prison and send her [C]hildren back into foster care[;]" and (5) it is Children's best interest to terminate Mother's parental rights)).

Accordingly, we affirm the decrees of the Court of Common Pleas of Lehigh County that terminated Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/30/2016

CLERK OF ORPHANS
COURT DIVISION
LEHIGH COUNTY

2015 JUL -1 A 8: 06

COURTHOUSE
ALLENTOWN, PA.

## IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

In re: Involuntary Termination of Parental Rights to :

| | |
|---|---|
| A.V., | No.: A2014-0041 |
| N.L.C.C., and | No.: A2014-0042 |
| B.E.C.C., | No.: A2014-0043 |
| Minors | Assigned Judge: Douglas G. Reichley, J. |

\* \* \* \* \* \* \* \* \* \* \*

APPEARANCES:

Kathleen M. Williamson, Esquire
    on behalf of Lehigh County Office of Children & Youth Services

Joanne Sallit Hull, Esquire
    on behalf of the minor children

Catherine L. Kollet, Esquire
    on behalf of ███████████, Mother of the minors

\* \* \* \* \* \* \* \* \* \* \*

**DOUGLAS G. REICHLEY, J.**

### ADJUDICATION

On July 7, 2014, LCOCYS filed petitions to involuntarily terminate Mother's parental rights to the above-captioned minors. The hearing on the involuntary petitions began on

September 5, 2014, and reconvened on December 11 and December 12, 2014. The transcripts of the hearings were filed on February 2, 2015. Petitioner filed its Proposed Findings of Fact and Conclusions of Law on March 2, 2015; counsel for Mother and counsel for the children filed their Proposed Findings of Fact and Conclusions of Law on April 7, 2015.[1] The Court having determined that oral argument is not necessary, this matter is ripe for adjudication.

FINDINGS OF FACT

1. A.V. is a female child born on February 1, 2004; she is 11 years old.

2. N.L.C.C. is a female child born on June 22, 2006; she is 9 years old.

3. B.E.C.C. is a male child born on January 24, 2008; he is 7 years old.

4. The biological mother of all three children is ██████████████████████████████ ██████████████████ (hereafter "Mother").

5. The children's fathers agreed to terminate their parental rights.[2]

6. Mother and the children lived with her family in Florida until 2008. At some point in 2008, Mother and the children moved to Pennsylvania and lived with mother's paternal uncle, Jose Colon Morales. N.T. 9/5/14 at 18; 12/11/14 at 25-26, 47; N.T. 12/12/14 at 36, 139.

7. Lehigh County Office of Children and Youth Services (hereafter "LCOCYS" or "the agency") has been involved with Mother and her children since September of 2008. The

---

[1] A.V.'s father was present at the September 5, 2014, hearing and voluntarily relinquished his parental rights pursuant to 23 Pa.C.S.A. §2501 before the undersigned. *See* N.T. 12/11/14 at 5. Following submission of the above-referenced documents, the Court initially held off on further action on this matter while waiting to receive Proposed Findings of Fact and Conclusions of Law from the father of N.L.C.C. and B.E.C.C., but upon further review determined that he voluntarily relinquished his parental rights with a written consent he signed on August 28, 2014, pursuant to 23 Pa.C.S.A. §2504, which was confirmed at the beginning of the December 11, 2014, hearing. N.T. 12/11/14 at 5.

[2] *See* footnote 1, *supra*, regarding the children's fathers.

LCOCYS case has never been closed. N.T. 9/5/14 at 17; N.T. 12/11/14 at 43-44; 12/12/14 at 121.

8. The initial involvement of LCOCYS stemmed from a referral from law enforcement regarding medical neglect of N.L.C.C. She sustained second and third degree burns from hot liquid on the stove. Mother failed to seek medical attention. N.L.C.C. was two years old at the time. She is nine years old now and still has scars from the burns. Mother was arrested and charged with child endangerment. The police took emergency custody of the three children and their older brother.[3] Mother was later sentenced to 11½ to 23 months imprisonment at Lehigh County Prison ("LCP") followed by 36 months of probation for child endangerment. N.T. 9/5/14 at 6-7, 9, 12; N.T. 12/11/14 at 56; P-2, Lehigh County Sentence Sheet and Criminal Docket, CP-39-CR-0003934-2008.

9. On September 16, 2008, the children were adjudicated dependent and placed into foster care. N.T. 9/5/14 at 7, 9, 11.

10. Mother was released from incarceration in June of 2009. She made substantial progress with reunification goals set by the Dependency Court. By the end of February 2010, dependency had been vacated for all three children.[4] N.T. 9/5/14 at 14-17.

11. N.L.C.C. and B.E.C.C. were returned to Mother in November of 2009. N.T. 9/5/14 at 16.

12. In April 2010, A.V. was returned to Mother after living for a period in Connecticut with her biological father. N.T. 9/5/14 at 25.

---

[3] This brother is not a subject of the instant adjudication. At the time of the hearing, he was still adjudicated dependent and under the supervision of LCOCYS, but he was unwilling to be adopted. Because he is over 12 years old, his consent would be necessary.

[4] A.V.'s dependency had been previously vacated in favor of her biological father in Connecticut. N.T. 9/5/14 at 15.

13. One year later, on April 18, 2011, LCOCYS learned that Mother's live-in uncle, Jose Colon Morales, was sexually abusing then-seven-year old A.V. He was arrested and pled guilty to rape of a child. LCOCYS later learned Jose Colon Morales was Mother's paramour. N.T. 9/5/14 at 18-20; N.T. 12/11/14 at 25-26, 48-49; N.T. 12/12/14 at 37, 122.

14. It was not until approximately November of 2012 that N.L.C.C. disclosed Mother's uncle sexually abused her, too. By that time, N.L.C.C. was no longer in Mother's care, and Mother's uncle was still incarcerated for raping A.V. N.T. 9/5/14 at 18-20, 34-35; N.T. 12/11/14 at 25-26, 48-49, 58.

15. Child Protective Services investigations resulted in an indicated status of sexual abuse perpetrated by Mother's uncle on each of the little girls. N.T. 9/5/14 at 20; 35.

16. In April of 2011, as a result of the known sexual abuse inflicted on A.V. by her mother's paramour, LCOCYS referred seven-year-old A.V. to trauma therapy and referred Mother to non-offending parent treatment. N.T. 9/5/14 at 21-22.

17. Mother would not take the child to trauma therapy if the child did not want to go; consequently, her attendance was very inconsistent. N.T. 9/5/14 at 21-22; N.T. 12/11/14 at 49; N.T. 12/12/14 at 128.

18. Although Mother did begin to attend non-offending parenting treatment at Confront, her attendance was inconsistent. N.T. 9/5/14 at 22.

19. In mid-January of 2012, Mother and the children moved to a new dwelling to live with Mother's new paramour, Eddie Ortiz. Mr. Ortiz is a convicted felon on federal parole for drug trafficking charges. N.T. 9/5/14 at 25-26; N.T. 12/12/14 at 16-18.

20. Mother was still on probation for child endangerment from the offense in 2008 involving N.L.C.C. One of the terms of Mother's probation was that she could not have contact with any other person on probation or parole. N.T. 9/5/14 at 26.

21. Mother did not disclose to LCOCYS that she was moving in with a convicted felon. After the agency learned of her paramour's criminal history, Mother continued to live with him despite instructions to the contrary. Consequently, Mother's probation was revoked. On August 20, 2012, she was sentenced to another 36 months of probation. N.T. 9/5/14 at 25-26; see also P-2, Lehigh County Sentence Sheet and Criminal Docket, CP-39-CR-0003934-2008, at page 11 of criminal docket.

22. On August 21, 2012, A.V. was again adjudicated dependent, this time based on Mother's failure to consistently provide mental health treatment. She remained in Mother's home under a Protective Services Order. Mother was ordered to:

    1) Complete non-offending parenting treatment and follow all recommendations;
    2) Comply with mental health treatment and all recommendations;
    3) Obtain and maintain appropriate legal income and stable housing;
    4) Comply with terms of probation/parole;
    5) Ensure that A.V. attended and completed sexual abuse victimization treatment and follow any additional recommendations;
    6) Cooperate with the Agency in all other recommended services.

Mother was to have no contact with . N.T. 9/5/14 at 27-30; N.T. 12/11/14 at 123; see also Order adopting Master's Recommendation for Adjudication – Child Dependent, signed Aug. 27, 2012, following hearing held Aug. 21, 2012.

23. On October 4, 2012, Mother was arrested for violating the terms of her probation by continuing to reside with . Upon her arrest, Mother left her three children in the care of this convicted felon even though he was not to be residing in the home or acting as a caretaker to the children. An Order for Emergency Protective Custody was granted

with respect to all three children. Mother remained incarcerated until November 5, 2012, when she was resentenced to 23 months in LCP followed by an additional 12 months of probation. She was granted immediate parole on that date. N.T. 9/5/14 at 33; N.T. 12/11/14 at 57; N.T. 12/12/14 at 125; P-2, Lehigh County Sentence Sheet and Criminal Docket, CP-39-CR-0003934-2008, at page 12 of criminal docket; P-3, Order adopting Master's Recommendation Regarding Modification of Child's Placement, signed Nov. 7, 2012, following hearing held Oct. 16, 2012.

24. While Mother was still incarcerated on this probation violation, N.L.C.C. and B.E.C.C. were adjudicated dependent on October 16, 2012. All three children were placed in foster care. They have never returned to Mother's care. The Dependency Court ordered Mother to resolve all criminal charges in addition to the prior services ordered on August 21, 2012. N.T. 9/5/14 at 31-34; *see also* P-3, Order adopting Master's Recommendation Regarding Modification of Child's Placement, signed Nov. 7, 2012, following hearing held Oct. 16, 2012.

25. On September 4, 2013, Mother's probation was revoked after she was found to be again residing with Mr. Ortiz, a convicted felon. Mother has been incarcerated ever since, having been ordered to complete the balance of her sentence with no eligibility for parole or reentry. N.T. 9/5/14 at 44-45; *see also* P-2, Lehigh County Sentence Sheet and Criminal Docket, CP-39-CR-0003934-2008, at page 14 of criminal docket.

26. Mother's earliest possible release date is July 5, 2015. She will have 12 months of probation following her release. N.T. 9/5/14 at 44-45.

27. When Mother is released, whether in July of 2015 or later, LCOCYS would expect Mother to demonstrate the following in order to safely return the children to her care:

6

1. obtain and maintain appropriate and safe housing;
2. maintain appropriate income;
3.. successfully complete non-offending parenting treatment; and
4. engage in and manage her own mental health issues over a period of time.

N.T. 12/11/14 at 37-38.

28. LCOCYS would expect Mother to successfully demonstrate all of the above for at least six months before the agency would even consider returning the children to Mother's care. It would be at least a year or more until the agency would consider vacating dependency and allowing Mother to parent without LCOCYS intervention. N.T. 12/11/14 at 37-38.

29. Despite a host of services that were provided to Mother between her incarcerations, Mother never adequately complied with any of the court-ordered services for an appreciable period of time. From October 4, 2012, when the children were removed from her care for the second time, the Dependency Court orders regarding services for the family did not change, with two exceptions: Reunification services were added on July 16, 2013, and resolution of criminal matters was added on October 16, 2012. N.T. 9/5/14 at 21-22, 38, 43, 46, 48; N.T. 12/11/14 at 104-105, 118-121; N.T. 12/12/14 at 125.

30. Mother never maintained safe, appropriate housing for the three children. She was either homeless or in and out of the hospital psychiatric unit or in a transitional living group home. N.T. 9/5/14 at 38, 42; N.T. 12/11/14 at 36, 54; N.T. 12/12/14 at 51-54, 62, 124.

31. Mother never maintained an appropriate legal source of income, although she was in the process of applying for Social Security benefits at various points. She was unsuccessful in maintaining employment at LCP. Although she testified she will have to get a job upon release from incarceration in order to provide for the children, she later admitted she is

unable to do much because she has heart and kidney disease. N.T. 9/5/14 at 42; N.T. 12/11/14 at 18-19, 36; N.T. 12/12/14 at 51-54, 62, 77, 86, 135, 140.

32. Mother never ensured that A.V. attended and completed sexual abuse trauma therapy; in fact, it was not until March of 2014 that A.V. began the therapy while in foster care. N.T. 12/12/14 at 20-21, 40-41.

33. Mother did not comply with the terms of her probation and parole as ordered by both the Criminal Division and the Juvenile Division.

34. Regarding Mother's compliance with mental health treatment and all recommendations, although Mother has been involved since 2008 with various inpatient and outpatient mental health facilities, including transitional housing intended to meet her need of mental health services, Mother has not demonstrated an ability to comply with mental health treatment and all recommendations as ordered. N.T. 12/11/14 at 43-44.

   a. Mother has depression and bipolar disorder, for which she requires prescription medications. Additionally, Mother has post-traumatic stress disorder. Although she herself was a victim of abuse, Mother has never adequately dealt with her own trauma from her own abuse. N.T. 12/11/14 at 43, 108, 110; N.T. 12/12/14 at 68-69, 76.

   b. Before she moved in with Mr. Ortiz in January of 2012, Mother never achieved an appropriate pattern of medication management or attending to her own mental health needs. From December of 2012 until she entered transitional housing in July of 2013, Mother had back-to-back hospitalizations for depression and suicidal ideations, as well as hallucinations and hearing voices. For a period of time in 2013, Mother was, however, cooperating with her outpatient mental health therapy at Hispanic American

Organization.[5] N.T. 9/5/14 at 36-43; N.T. 12/11/14 at 104-105, 110; N.T. 12/12/14 at 50, 53; *see also* P-3, Findings of Fact dated Aug. 5, 2013, related to July 16, 2013, hearing.

   c. When not incarcerated, Mother would periodically run out of medications. Now that she is incarcerated, LCP consistently provided Mother with the prescriptions she needs for her mental health. However, as of November of 2014, Mother has been refusing to take her mental health medication, as well as medication for seizures. N.T. 12/11/14 at 110; N.T. 12/12/14 at 76, 126, 142.

35. Mother never successfully completed non-offending parenting treatment, despite multiple attempts with more than one provider. Mother was discharged several times from Confront, first in August of 2011 and again in May of 2012, for inconsistent attendance, then in October of 2012 when she was incarcerated, then in January of 2013 for lying to staff. A new referral was made to Forensic Treatment Services for Mother in March of 2013: Mother's attendance was again inconsistent and she was still dishonest with her therapist. N.T. 9/5/14 at 22-25, 31, 33, 39-43, 46; N.T. 12/11/14 at 36-37, 48; N.T. 12/12/14 at 6, 10-11, 14-15, 47-49, 70; *see also* P-7, Letter dated Nov. 2, 2012 from Confront.

36. Mother was referred to non-offending parenting treatment for two reasons: because A.V. was victimized by her maternal great uncle who was living in the home, and because of Mother's medical neglect for N.L.C.C. after a serious medical injury. Some of the major

---

[5] The record is not clear regarding Mother's compliance with mental health treatment from January until December of 2012.

goals of treatment were to address Mother's dependency on men, her own abuse issues, the abuse issues of her children, and her inability to identify danger where danger existed in regards to her children. N.T. 12/12/14 at 8, 47-49.

37. Ann Friedenheim worked with Mother at Confront. She has two master's degrees, one of which is in trauma and childhood development. She explained that the purpose of non-offending parenting treatment was to help Mother, as the non-offending parent,

> gain an understanding of [her] role as a parent; [her] need to protect [her] children; make good decisions on [her] children's behalf; be able to sometimes put [her] children's needs before [her] own; how to believe [her] children about any abuse situations; how to make sure that their medical needs are provided for, their safety is provided for; and that that relationship between the child and the parent is a trusted relationship where the child feels free to come and speak to the parent about anything that's on their mind; also for the parent to understand what the effects of abuse are, whether it's sexual abuse of physical abuse or neglect; and to understand the children's emotional needs if the child's been abused; and also to make very good decisions about who comes into the ... inner circle of the family and really be able to discern if a person is safe or poses undue risk to that individual or the family unit, especially the vulnerable children.

N.T. 12/12/14 at 6, 8-9.

38. Both of the therapists providing non-offending parent treatment to Mother agreed that non-offending parenting treatment is not effective when a parent is lying or hiding the truth, as Mother consistently did. N.T. 12/12/14 at 19-20, 70. *See, e.g.,* N.T. 12/11/14 at 108 (Mother making excuses for why Lehigh Valley Families Together could not meet Mother's live-in paramour, her paternal uncle); N.T. 12/12/14 at 18-19 (Mother told Confront she was consistently taking A.V. to trauma therapy and providing B.E.C.C. with mental health medication, which was not the case); N.T. 12/11/14 at 124-127; N.T. 12/12/14 at 20-21 (Mother covered up her continuing contact with Mr. Ortiz); N.T. 12/11/14 at 24-25; N.T. 12/12/14 at 86-87 (Mother made false statements in prison and

10

was placed in segregation); N.T. 12/12/14 at 84-87, 94-95 (Mother maintained illicit communication through covert written notes to another inmate).

39. Even though non-offending parent services were offered to Mother between May of 2011 and September of 2013, Mother made no progress regarding choosing appropriate people to whom her children could be exposed. She made no progress toward even having insight into the issue. N.T. 12/12/14 at 17, 22, 34; N.T. 12/12/14 at 54, 64-65.

a. From 2008 through April of 2011, Mother allowed her uncle to live with her children as her paramour even though there had been rumors in the family regarding his history, which caused her doubt regarding whether he was of good character. Although Mother felt guilt about the abuse her daughter suffered, she never tied that guilt to her own choices in romantic partners. She was more focused on her own emotion around what he had done. N.T. 12/12/14 at 37, 39, 60.

b. Mother's next relationship was with Mr. Ortiz. Mother knew he had a criminal history, yet the fact that he is a convicted felon did not "raise a red flag" for Mother. Mother did not "see him as a felon." Mother repeatedly allowed Mr. Ortiz to live with or have contact with her and her children. Mother continued the relationship even though she had specifically been told he was not a safe person for the children to be exposed to. She knew she was not allowed to have any contact with him, that she was violating the terms of her probation, and that she could go to jail for continuing the relationship, which would place her children back into foster care with strangers, yet Mother chose to be with him anyway. In fact, Mother had plans to reunite herself and her children with Mr. Ortiz after her probation and her involvement with LCOCYS ended, although Mother denied this at the hearing, stating "I don't even know where

11

he's at." N.T. 9/5/14 at 25-26, 31; N.T. 12/11/14 at 123; N.T. 12/12/14 at 40, 53-54, 122-125, 130, 132.

c. When Mother was in transitional housing in 2013, she met a 78-year old man, purportedly a relative. Mother intended to move in with him with the children. Mother considered it unnecessary to provide information about him to LCOCYS. because she viewed him as completely harmless. Even after her non-offending parenting therapist raised the issue with Mother, Mother persisted with this view. She was uninterested in checking his background to make sure, as much as possible, that he did not pose a risk to the children. N.T. 12/12/14 at 63-64, 131.

d. In prison, Mother formed at least two romantic relationships with fellow prisoners. Mother had plans to live as a family with each of her prison paramours once Mother and the respective paramour were both released from prison. In her illicit written communication with the male inmate, Mother sometimes referred to him as "Husband" and to herself as "Wife." The record was unclear as to why this relationship ended. Mother had plans to marry a female inmate when they were both released from LCP, but the female inmate passed away. Mother felt these relationships were good because each of the inmates expressed willingness to help with the children and be supportive of Mother. N.T. 12/11/14 at 50-51, 59; N.T. 12/12/14 at 84-87, 89-90, 94-95, 132-134.

e. As recently as the last day of the hearing, Mother saw absolutely no problem with giving inmates and convicted felons a chance to be part of her family. N.T. 12/12/14 at 132-133.

12

40. The caseworker's assessment was that Mother had shown no potential to improve with regard to protecting her children from other offenders. N.T. 12/11/14 at 48; N.T. 12/12/14 at 118-121.

41. Non-offending parent treatment was not available to Mother as an LCP inmate. Although Mother did obtain two certificates in decision making and something called life smart, she did not take advantage of attending other programs at LCP that could demonstrate her commitment to her children, and she declined to finish her GED. N.T. 12/12/14 at 79-84, 90-93, 96-98, 141-142.

42. At the close of the termination hearing, the children had been continuously out of Mother's care for over 24 months. Mother was incarcerated for 13 of those months because of her choices to maintain her relationship with Mr. Ortiz. N.T. 12/11/14 at 24.

43. As of the last termination hearing date, the children had spent roughly 50 hours with Mother since they were adjudicated in October 2012. All visits were supervised. N.T. 12/11/14 at 37.

44. When Mother was in and out of the hospital for mental health treatment, she failed to confirm several visits, so her visits with the children were very sporadic. Now that the children are brought to visit Mother at LCP, since September of 2013, the children have consistently visited with Mother and with each other biweekly. The majority of their visits occurred at LCP. N.T. 9/5/14 at 37-40, 50; N.T. 12/11/14 at 21-22, 26-27, 37.

45. Mother and the children greet one another affectionately when she is brought to the visitation room at LCP. The children appear happy at visits, but the caseworker indicated it was impossible to know whether they are happy to see Mother or just happy to see each

13

other. At this point, the children have no difficulty saying their goodbyes and leaving Mother at the end of a prison visit. N.T. 12/11/14 at 30, 32, 55, 100.

46. At times N.L.C.C. and B.E.C.C. have not wanted to see Mother. A.V. has been emotionally ambivalent about visiting Mother at LCP. At times she wants to go and looks forward to it; at other times, she acts out or says out loud that she does not want to go. N.T. 12/11/14 at 21-22, 93.

47. At visits, Mother interacts most with her eldest son. When he is not there, she interacts most with A.V. If A.V. is not there, Mother interacts more with N.L.C.C. and B.E.C.C. B.E.C.C. is the least engaged in the visits. He is mostly disinterested and detached. N.T. 12/11/14 at 55, 91, 99-100; N.T. 12/12/14 at 106-108.

48. At visits, even if the children are interacting inappropriately, such as by hitting one another, Mother does not intervene. N.T. 12/11/14 at 94-95.

49. During several visits, Mother has engaged the children in inappropriate conversations regarding reunification with them. Mother persisted in offering false hope to the children despite instructions to stop the behavior because it was detrimental to the children. N.T. 12/11/14 at 31-32, 40-41, 68, 84, 88-98, 101.

50. At a visit on December 4, 2012, Mother discussed with the children her plans to get an apartment so they could come live with her. N.L.C.C. and B.E.C.C. responded that they want to stay in their current placement and do not want to return to Mother's care. A.V. responded that she would act out on purpose and lower her grades so she could be with Mother. N.T. 12/11/14 at 59, 90, 102.

14

51. Mother sent letters to A.V. with inappropriate content indicating reunification would happen soon. Even after being instructed to mail letters to the agency, Mother persisted in sending them directly to A.V.'s foster home. N.T. 12/11/14, 66-72.

52. Mother has a fierce but unhealthy love for her children. She especially loves A.V. because A.V. knows what Mother likes, knows how to please Mother, knows how to take care of Mother, and knows how to make the food that Mother likes. N.T. 12/12/14 at 23, 112-113, 137.

53. Mother characterized A.V.'s bond with her as very strong. She described A.V. as affectionate, wanting a lot of Mother's attention, and not wanting to share Mother with her younger siblings. N.T. 12/12/14 at 111-112.

54. Mother described a somewhat ambivalent bond that exists between N.L.C.C. and herself. She recognized that sometimes N.L.C.C. has a difficult time coming to the prison and sometimes wants to push Mother away. N.T. 12/12/14 at 109-111.

55. Mother explained she and B.E.C.C. had a strong bond when he was an infant, but he was in foster care until he was a toddler. She felt the bond eventually developed again when he returned home. She admitted that since her incarceration in 2012, her bond with B.E.C.C. has been strained at best, to the point that he sometimes hides from her or is grumpy or moody because he does not want to talk to her. N.T. 12/12/14 at 106-108.

56. According to Mother, she tried her best and her hardest in the past to give her children everything they needed. N.T. 12/12/14 at 114.

57. Mother admits her choice not to get N.L.C.C. medical attention resulted in the children being taken way for more than a year; that her ongoing contact with a convicted felon resulted in two probation revocation hearings and in her current incarceration; that her

children were therefore again placed in foster care; and that her children have all suffered academically because of her choices, with B.E.C.C. repeating kindergarden, N.L.C.C. repeating first grade, and A.V. having trouble with school to the point that at times Mother's visits at LCP had to be reduced. N.T. 9/5/14 at 50; N.T. 12/11/14 at 21-22, 26-27; N.T. 12/12/14 at 117, 120, 122-125, that her

58. Mother was not at all concerned about disrupting the children's schooling when she moved them mid-year into new their schools in January 2012 to live with Mr. Ortiz. N.T. 12/12/14 at 17-18.

59. Mother explained her reason for not attending non-offending parent treatment Confront because it was uncomfortable. She wants to feel comfortable and not be judged. N.T. 12/12/14 at 135.

60. Ann Friedenheim, the Confront therapist, opinioned that as of her last communication with Mother in or around 2012, Mother was not capable of keeping A.V. safe. Mother was more focused on herself than on making good decisions for her children. She explained, "I don't know that she's capable of really understanding what the needs of her children are if they're different than her own," and she has difficulty understanding how she impacts on her children. N.T. 12/12/14 at 13, 23, 40-41.

61. In 2011, service providers noted a definite bond between Mother and the children, but at times Mother was very inattentive. If stressed, Mother would take on a childlike role and her eldest son or A.V. would take over the role of parent. Mother's attentiveness did not improve despite the services designed to help those issues. N.T. 12/11/14 at 104-105, 111-113.

she capable of real

62. When she lived with her younger siblings, A.V. acted in a parentified role toward them like a caregiver, such as cutting their food, and otherwise acting in a parental role toward them. Currently, her own perception of her role as a sister and as a daughter is that of caretaker. N.T. 9/5/14 at 51; N.T. 12/11/14 at 75-76.

63. A.V. also feels like a caretaker for Mother's emotional needs. She is very sensitive toward her mother's feelings and does not want to hurt her mother. She feels responsible for Mother's well-being and Mother's success in reuniting the family. She is concerned about how the birth family, especially Mother, will be affected if A.V.'s permanency plan does not include her birth family. She feels a strong loyalty for her mother and has a fantasy hope that somehow the whole family will be back together again. N.T. 12/11/14 at 76-77; N.T. 12/12/14 at 20-21, 40-41.

64. Ms. Friedenheim, who provided counseling to both Mother (non-offending parent treatment) and A.V. (trauma therapy), was not able to characterize A.V.'s relationship with her mother as a healthy one. N.T. 12/12/14 at 40-41.

65. The children have had several placements since their separation from Mother following her arrest on October 4, 2012. They were initially placed in foster care together. N.T. 9/5/14 at 31.

66. On November 20, 2012, A.V. was moved to a new foster home due to conflict with her siblings. N.T. 9/5/14 at 36-37; see also P-3, Order Regarding Modification of Child's Placement, signed Jan. 8, 2013, following hearing held same date, and Stipulation for Change of Placement filed Jan. 2, 2013.

67. In March of 2013, a Court-Appointed Special Advocates ("CASAs") were appointed for the children. N.T. 9/5/14 at 40.

68. N.L.C.C. and B.E.C.C. were moved to a pre-adoptive foster home on September 13, 2013, where they still currently reside. The home in which N.L.C.C. and B.E.C.C consists of two parents, N.L.C.C. and B.E.C.C., and four additional foster siblings. N.T. 12/11/14 at 35-36.

69. N.L.C.C. and B.E.C.C. assimilated very well into the current foster family to the point that they interact like family members. N.L.C.C. is involved in dance along with an older foster sibling. The entire family gets involved to show their support at recitals and big rehearsals. B.E.C.C. is in half-day kindergarten and is the only child at home in the afternoon until the older children come home. He thrives on the one-on-one attention he gets from his foster father, who is a stay-at-home dad. N.T. 9/5/14 at 45-46, 49; N.T. 12/11/14 at 28, 35-36; *see also* P-3, Findings of Fact dated Jan. 31, 2014, relating to Jan. 7, 2014 permanency review hearing; Findings of Fact dated Mar. 31, 2014, relating to Mar. 18, 2014 permanency review hearing.

70. Both children receive play therapy, and B.E.C.C. takes mental health medication. N.T. 9/5/14 at 50; 12/11/14 at 53.

71. On June 13, 2014, A.V. was moved to a pre-adoptive home where she continues to reside. A.V.'s home consists of a single foster parent who is a school teacher; A.V. is the only child in the home. A.V. and her foster parent read together every night for the dual purpose of improving A.V.'s reading skills and helping to grow the bond between A.V. and the foster parent. During the day they typically engage in activities or visits to special places or family or friends. N.T. 9/5/14 at 48-50; N.T. 12/11/14 at 19-20, 28, 33, 74; *see also* Findings of Fact dated July 22, 2014, relating to July 15, 2014 permanency review hearing.

72. A.V. is diagnosed with intermittent explosive disorder, mood disorder, post-traumatic stress disorder, and oppositional defiance disorder. She was hospitalized between October 15 and October 25, 2012, for suicidal ideation. She takes medication, attends trauma therapy, and receives out-patient mental health services. She has experienced significant losses in her life. A.V.'s foster parent has been proactive to solve issues before they turn into problems and ensure that A.V. gets her medication and attends therapy appointments. N.T. 9/5/14 at 34-35, 37, N.T. 12/11/14 at 25-26, 52.

73. A.V.'s CASA described a tremendous positive change in A.V. in the six months since her placement in the current foster home, which he attributed to the stability and support she receives there. N.T. 12/12/14 at 101-103.

74. However, the false hope Mother offered on December 4, 2014 regarding reunification turned that progress on its head. A.V. indicated she may sabotage the placement to ensure she could return to Mother. Since then, A.V. has been avoidant in terms of attachment and relationship with her foster mother. She has completely shut down any relationship. According to her trauma therapist, she has completely shut down all feelings, even feelings of happiness. N.T. 12/11/14 at 74-77, 80-81; N.T. 12/12/14 at 101-103.

75. With the question of permanency looming over her, A.V. does not feel safe expressing her feelings. She is very aware that what she says may be used to hinder reunification with Mother. A.V. wishes she lived with N.L.C.C. and B.E.C.C. and could be adopted by the same family. She would also like to be reunited with Mother. Her fantasy is for the whole family to be reunited. N.T. 9/5/14 at 51-52; N.T. 12/11/14 at 73, 78-79, 83-84; N.T. 12/12/14 at 41.

76. A.V.'s foster parent works hard to support A.V. and reassure her they will work through her issues together. She remains committed to adopting A.V. if she should become legally freed for adoption. The caseworker had no concerns about the foster parent's ability to meet A.V.'s needs as she continues to grow. N.T. 12/11/14 at 34-35, 80-81.

77. Both therapists who provided trauma therapy to A.V. indicated she cannot move forward in working through her past abuse and neglect issues until she achieves permanence in a stable, settled, safe home. Her current therapist believes once A.V. achieves permanence, she will be able to work through her past trauma and unprocessed grief, but A.V.'s placement must be with someone who will support her treatment and promote healing; otherwise, she is at risk for future victimization because she is cannot recognize for herself the severity of her past trauma. N.T. 12/11/14 at 73-75, 78-79, 82, 84; N.T. 12/12/14 at 42.

78. A.V.'s CASA supported termination of Mother's parental rights because he felt achieving permanency would allow A.V. to address her mental health issues and provide her with the opportunity to learn to trust. N.T. 12/12/14 at 101.

79. N.L.C.C.'s and B.E.C.C.'s CASA also supports termination of Mother's parental rights so the two children may achieve permanency and move forward with their lives. *See* G-2, CASA Report to the Court dated Aug. 22, 2014.

80. The caseworker opined that termination of Mother's parental rights to all three children would best serve the children. She explained the children need permanency, they need to know their needs will continue to be met, and they deserve to live without agency involvement in terms of caretaker approvals and being able to go on vacation without court approval. N.T. 12/11/14 at 38-39.

81. As of the last day of the termination hearing, Mother had no home plan for her release from prison. She did, however, plan to visit the family of her deceased former female paramour and the paramour's grave site on the day she is released from prison. Mother wants to leave Pennsylvania and move to Florida, where her family support is, with the children, but she does not know if her probation is transferrable. N.T. 12/12/14 at 117, 119, 140.

82. Although Mother reasons that her parental rights should not be terminated because other mothers are worse and still have their children, Mother does admit that the children are being well taken care of in their foster homes. N.T. 12/12/14 at 119, 137.

83. After missing almost three years of their lives, Mother testified she is willing to give it her all this time, comply with all requirements to get her children back, and get it right. N.T. 12/12/14 at 115, 117-120, 132.

CONCLUSIONS OF LAW

1. Petitioner established by clear and convincing evidence that Mother by her conduct continuing for a period of at least six months immediately preceding the filing of the Petition to terminate her rights evidenced a settled purpose to relinquish her parental claim to A.V., N.L.C.C., and B.E.C.C. and Mother refused to or failed to perform parental duties.

2. Petitioner established by clear and convincing evidence that the repeated and continued incapacity, neglect and refusal of Mother has caused A.V., N.L.C.C, and B.E.C.C to be without essential parental care, control or subsistence necessary for their physical and mental well-being, and the conditions and causes of the incapacity, neglect and refusal cannot or will not be remedied by Mother in a reasonable period of time.

3. Petitioner established by clear and convincing evidence that A.V., N.L.C.C., and B.E.C.C. were removed from Mother's care by the court for a period in excess of six months, the conditions which led to the removal of the children continue to exist, Mother cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to Mother are not likely to remedy the conditions which led to the removal of the children within a reasonable period of time, and termination of the parental rights would best serve the needs and welfare of the children.

4. Petitioner established by clear and convincing evidence that A.V., N.L.C.C., and B.E.C.C. have been removed from Mother's physical and legal custody by the court, more than twelve months have elapsed from the date of removal, the conditions which led to the removal of the children continue to exist, and termination of parental rights would best serve the needs and welfare of the children.

5. Petitioner established by clear and convincing evidence that the termination of Mother's parental rights to A.V., N.L.C.C., and B.E.C.C. best meets the needs and welfare of the children and best provides for their development, physical and emotional needs.

6. Petitioner established by clear and convincing evidence that the termination of Mother's parental rights to A.V., N.L.C.C., and B.E.C.C. is appropriate in this case.

DISCUSSION

The grounds for involuntary termination are set forth in 23 Pa. C.S.A. §2511. Petitioner must establish at least one ground for termination. LCOCYS petitioned to terminate Mother's parental rights on the grounds of 23 Pa. C.S.A. §2511(a)(1), (2), (5), (8), and §2511(b).

The statute provides, in pertinent part, as follows:

22

## § 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

23

inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parents. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein, which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S.A. §2511.

This Court must decide whether LCOCYS satisfied its burden of showing that termination of parental rights is appropriate in this case based on Pennsylvania law. Our inquiry in a termination of parental rights case is two-step inquiry. *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa. Super. 2006). First, the Court assesses at the parent's conduct. *Id.* Petitioner has the burden of demonstrating by clear and convincing evidence that a statutory reason for termination exists. *Santosky v. Kramer*, 455 U.S. 756 (1982). After the Court has determined a statutory ground for termination has been established, the Court's second inquiry is on the child's needs and welfare, a paramount concern. *In re Adoption of R.J.S., supra.* The Court must examine the circumstances of the case and also consider all explanations offered by the parent to determine if the evidence, in light of the totality of the circumstances, clearly warrants involuntary termination. *Matter of Adoption of Charles E.D.M., II,* 708 A.2d 88, 91 (Pa. 1998). Petitioner has the burden of producing evidence that is so clear, direct, weighty and convincing as to enable the Court to come to a clear conviction of the precise facts at issue without hesitation of the truth. *In re Child M.,* 681 A.2d 793 (Pa. Super. 1996).

All children are entitled to certain irreducible minimum requirements from their parents, including adequate housing, clothing, food, love and supervision. *In re J.W.,* 578 A.2d 952 (Pa. Super. 1990).

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of

24

maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted). Thus, the Court must also examine the parent's post-abandonment contact with the child, which, to be legally significant,

> must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his [or her] parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted).

For the reasons discussed below, and giving primary consideration to the developmental, physical and emotional needs and welfare of the minors, we find that Petitioner clearly and convincingly established statutory grounds for the termination of Mother's parental rights to A.V., N.L.C.C., and B.E.C.C., and that the involuntary termination of Mother's parental rights will best serve the needs and welfare of the minors.

The original petitions to terminate Mother's rights were filed on July 7, 2014. The children were adjudicated dependent and placed in foster care approximately 32 months ago. For the past 21 months, Mother has failed to perform parental duties for the minors due to her incarceration, with the exception that Mother did attend visits with the children due to the fact that they were brought to her at LCP.[6]

---

[6] We also note that Mother did send letters to A.V., but because the letters contained inappropriate content and Mother sent them in a manner that was uncooperative with LCOCYS directives, we do not consider this a fulfillment of parental duty.

Because of her choice to avoid non-offending parent treatment, Mother failed to perform any parental duties during the many months the children were in foster care prior to the termination hearing. Mother did not provide for their everyday needs such as housing, clothing, food, or supervision. She did not take them to the doctor, to therapy, or put them to bed. Instead, the children's needs were met by their respective foster families. Mother's repeated and continued refusal to comply with court-ordered services has caused the children to be without essential parental care, control or subsistence necessary for their physical or mental well-being.

If Mother did not get into more trouble in prison, she is likely to be released from prison soon. However, the children will not be able to live with her for a minimum of six months, and then only if she consistently complies with all of the recommendations of LCOCYS. Those recommendations are that Mother obtain and maintain appropriate and safe housing; maintain appropriate legal income; successfully complete non-offending parenting treatment; and engage in and manage her own mental health issues over a period of time.

Unfortunately, Mother's past choices are an indicator of her likely future behavior, and it does not bode well for the children's safety or for reunification. During the 11 months before her incarceration, Mother never complied with the Dependency Court orders that required her to obtain and maintain appropriate stable housing and legal income; take A.V. to trauma therapy; complete non-offending parenting treatment and follow all recommendations; comply with her own mental health treatment and all recommendations; comply with the terms of her probation/parole; and resolve her criminal matter. Instead of obtaining stable housing, Mother was homeless at times and in and out of the psychiatric unit. Now she has unilaterally decided to go off her mental health medications. She did not take A.V. to trauma therapy if the child did not want to go. She did not consistently attend her own non-offending parent treatment because it

was uncomfortable for her, and she did not want to feel judged. To the extent she did attend non-offending parent treatment, Mother was unable to make progress or gain insight into the treatment goals. She violated rather than complied with the dictates of her probation, even though she knew that choice could send her to prison and send her children back into foster care. She is in the process of resolving her criminal matter, in a sense, simply by being incarcerated.

Despite her promises to the contrary, it is highly speculative that Mother will pull it together and perform any differently once she is back out on the street. Based on her past choices, we are convinced that Mother will not make choices that put her in a position to perform parental duties for the children within a reasonable period of time. Accordingly, we find that Petitioner established by clear and convincing evidence that statutory grounds for termination exist pursuant to 23 Pa. C.S.A. §2511(a)(1) due to Mother's failure to perform parental duties for a period of at least six months immediately preceding the filing of the petition.

Similarly, Mother's inability to make good choices that will keep her children safe creates a continuing incapacity by which Mother has caused the children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being. The Court is very troubled by Mother's inability or refusal to protect her children with respect to her unwise choices regarding paramours. Mother has a gaping blind spot in this regard.

Even though both of her young daughters were sexually victimized by one of her blood relatives, with whom Mother herself had a sexual relationship, Mother persists in rather blithely inviting into her children's lives a string of paramours who can all be characterized as questionable at best. Mother was unsure whether her uncle was of good character; she saw no "red flags" regarding Mr. Ortiz' convicted felon status; she chose to continue the relationship, violated her probation on two separate occasions, and knowingly risked losing her children; and

27

she continues to form relationships with other inmates with plans to live together with her children when released from LCP. Although her newly found 78-year old purported relative was not her paramour, Mother was ready to move the children into his home without carefully checking into his background. She assumed he was safe merely because of his age – a dangerous assumption indeed. Worse, she did not heed the warnings of those tasked with helping her.

Mother chooses to meet her own needs rather than provide protection for the children. Non-offending parent treatment should have helped Mother with her poor choices in romantic partners, but it cannot help her if she fails to attend consistently, is dishonest with her therapists, and refuses to listen to them. Mother exhibited a pattern of deceit and failure to be open with service providers regarding the men in her life dating back to the inception of the LCOCYS case as set forth above in the 39th factual finding.

Mother's testimony at the hearing demonstrates clearly she is unable to remedy her incapacity and failure to parent in the near future. She still believes every inmate or convicted felon should be given a chance: She seemingly would welcome just about anyone into her family, to the great detriment of her children's safety. Accordingly, we find Petitioner has established by clear and convincing evidence that the grounds for involuntary termination set forth in 23 Pa. C.S.A. §2511(a)(2) have been met. Mother is free to make her own choices for herself, but she cannot continue to put her children at risk of a predator again.

Petitioner has also clearly and convincingly demonstrated that the grounds for termination as set forth in 23 Pa. C.S.A. §2511(a)(5) and (8) have been satisfied. These children were placed into foster care in October of 2012, approximately 32 months ago. The conditions which led to the children's placement continue to exist. These conditions were Mother's failure to provide for A.V.'s mental health needs and her incarceration for violating her probation by

maintaining an inappropriate relationship to the detriment of the safety of her children. As discussed above, Mother is unable to resolve these issues within a reasonable period of time, despite the host of services provided to Mother by LCOCYS over a lengthy period of time. Many of these services were specifically designed to help Mother make safer choices her children's sake.

While incarcerated for the past 22 months, Mother was incapable of complying with most of the ordered services. When not incarcerated, Mother demonstrated that she cannot or will not cooperate with LCOCYS services. It is also clear that she has no potential at this time to gain insight into making wiser choices for her children's safety.

Upon her release, it is entirely unclear whether Mother will make progress with learning to protect her children better. Based on Mother demonstrated inability to follow through with what is required of her within a reasonable period of time, this Court is convinced that termination will best serve the needs and welfare of the children to provide them with permanence and stability in healthy homes that will safeguard and protect them.

Finding that LCOCYS has established statutory grounds for termination Mother's parental rights under 23 Pa. C.S.A. §2511(a), we turn now to our primary consideration: the consideration of the needs and welfare of the children. 23 Pa. C.S.A. §2511(b). In addressing the needs and welfare of the children, it is necessary to consider the emotional bond between the parent and each child. *In re E.M.*, 620 A.2d 481 (Pa. 1993). In conducting a 23 Pa. C.S.A. §2511(b) analysis, the Pennsylvania Superior Court guides us as follows:

> In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond.

29

*Id.* However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles such as love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and where any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

We note at the outset that Mother clearly loves all of her children. However, as expressed above, the Court is primarily concerned with their safety and Mother's apparent inability to make wise choices for the protection of her children.

Due to Mother's medical neglect of N.L.C.C., all three children were away from Mother for over a year in 2008-2009. The most recent foster placement has lasted nearly three years. In the aggregate, B.E.C.C. has spent more than half of his life in foster care. He was an infant when he was separated from Mother the first time, was a toddler when he returned to her, and was approximately four years old when he left Mother's care again. Mother has not held a parenting role with B.E.C.C. since then; thus, the essential parental role she should have had has necessarily diminished. She has seen him for only approximately 50 hours, always supervised, in

30

the nearly three years since the children were removed from her care. When Mother does have the opportunity to see him, she generally focuses on her oldest son or A.V. rather than B.E.C.C. or his sister N.L.C.C. He is detached during visits at LCP, although he does sometimes show Mother physical affection. Under these circumstances, we find it is not surprising that B.E.C.C. has very little, if any, bond with Mother – a fact which Mother recognizes.

B.E.C.C. even verbalized to Mother that he does not want to return to her care: He wants to stay in his foster family with N.L.C.C. B.E.C.C. is very happy in the foster home. He is just like part of the family. He soaks up the attention he gets from his stay-at-home foster dad. The Court finds that Mother and B.E.C.C. have a minimal bond, if any, and permanent severance of parental ties will not result in any detriment to him. Permanence in this stable, loving, and nurturing home, where he will have continuing relationship with his siblings, will best serve the developmental, physical and emotional needs and welfare of this child.

N.L.C.C. is also assimilated into the foster home environment and is very happy there. Her foster family supports her in her dance activities. Regarding Mother, N.L.C.C. is more likely than B.E.C.C. to show Mother physical affection and to communicate during visits with Mother; she is not as detached during visits as her brother is. At times she has expressed she does not want to attend visits at LCP. She has been resentful that Mother reserves her attention during visits for the older children. Like B.E.C.C., N.L.C.C. verbalized to Mother that she does not want to return to Mother's care but wants to stay where she is.

To the extent that Mother and N.L.C.C. have an emotional bond, the Court finds that severing the bond permanently would not destroy a necessary and beneficial relationship. To the extent that the child may have some difficulty with her Mother's loss of parental rights, we are convinced the foster family will support her. The safety, stability, and permanence she will

31

achieve in a healthy home far outweigh the possibility that she may suffer detrimental effects from the termination of Mother's rights. *See In re T.S.M., a Minor*, 71 A.3d 251 (Pa. 2013).

With A.V., it is clear that she has a very strong bond and intense loyalty toward Mother. Unfortunately, the bond is equally unhealthy and detrimental. Rather than being parented, the child has had to assume the role of parent for her Mother. Rather than being protected by Mother, the child feels she needs to protect Mother emotionally and feels responsible for Mother's success regarding reunification. She has been unable to make any progress toward healing because Mother kept offering false hope of reunification. As such, Mother interfered with A.V.'s bond to her foster parent. What a tragedy for this child – and her siblings – that Mother's choices demonstrate so clearly Mother's continued incapacity to protect her children.

A.V.'s foster parent provides for all her needs, ensures she attends trauma therapy, supports her treatment, and promotes healing with her loving, unwavering support. Termination of Mother's parental rights will no doubt be very difficult for A.V., but it is clear that this child needs permanence in a safe, stable home so she can move forward with her life and begin to deal with and overcome her past abuse, neglect, trauma, and loss. *Id.*

Under the circumstances presented here, we find it is in the best interest of all three children to terminate Mother's parental rights pursuant to 23 Pa. C.S.A. §2511(b). For all of the foregoing reasons, the petitions of LCOCYS to involuntarily terminate Mother's parental rights to A.V., N.L.C.C., and B.E.C.C. are granted.

DATE: *June 30, 2015*          BY THE COURT:

DOUGLAS G. REICHLEY, J.

32